# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA,**
        **Plaintiff,**

    **v.**                                **Case No. 04-CR-146**

**LEE DAGOSTINI,**
           **Defendant.**

---

## SENTENCING MEMORANDUM

Defendant Lee Dagostini devised a scheme whereby he fraudulently obtained over 250 credit cards using fictitious personas, then ran up the balances on the cards. In furtherance of the scheme, he opened bank accounts in the names of his fictional personas and created a phony business – "Land's Consulting" – into which he deposited some of the proceeds of the scheme. He then "paid" himself with payroll checks drawn on the Land's account, which were signed by his wife. The scheme ultimately cost various banks and credit card issuers over $1.2 million in losses. The scheme was discovered when police officers, investigating a possible burglary in defendant's office, happened upon some of the cards and documents pertaining to fictitious identities. Defendant was arrested and charged, but continued to operate the scheme after his release. His continued conduct was discovered, he was detained, and the government charged additional offenses.

Defendant pleaded guilty, without an agreement with the government, to possession of 15 or more unauthorized access devices, 18 U.S.C. § 1029(a)(3), mail fraud, 18 U.S.C. § 1341, money laundering, 18 U.S.C. § 1956(a)(1)(B)(i), and conspiracy to commit money laundering while on pre-trial release, 18 U.S.C. §§ 1956(h) & 3147. The probation office

prepared a pre-sentence report, which calculated his offense level ("OL") as 38. On Counts 1 and 2, the PSR calculated the base OL as 7, U.S.S.G. § 2B1.1(a), plus 16 for amount of loss, § 2B1.1(b)(1)(I), plus 2 for 10 or more victims, § 2B1.1(b)(2)(A)(i), plus 2 for use of sophisticated means, § 2B1.1(b)(9)(C), and plus 2 for derivation of more than $1,000,000 in gross receipts from one or more financial institutions, § 2B1.1(b)(13)(A), for an adjusted OL of 29. On counts 3 and 4, the PSR calculated the base OL as 29, § 2S1.1(a)(1), plus 2 based on the conviction under § 1956, § 2S1.1(b)(2)(B), plus 2 for sophisticated laundering, § 2S1.1(b)(3), plus 3 for commission of count 4 while on pre-trial release, § 2J1.7, and plus 2 for aggravated role in the offense, § 3B1.1(c), for an adjusted OL of 38. All counts were grouped under § 3D1.2(c), for a final OL of 38. Defendant's criminal history category ("CHC") was II based on one prior conviction that scored 1 point, § 4A1.1(c), and his commission of part of the instant offense while on probation, which scored 2 points, § 4A1.1(d). The resulting advisory range was 262-327 months imprisonment.

Defendant objected to various guideline calculations and moved for downward departure on several bases. He also requested a sentence below the advisory range based on the 18 U.S.C. § 3553(a) factors. The government opposed all of defendant's requests and moved for an upward departure under § 4A1.3 based on uncharged criminal conduct. I held an evidentiary hearing, listened to the arguments of counsel, then denied all but one of defendant's guideline objections, as well as his requests for departure. I also denied the government's requested departure. Finally, I imposed a sentence somewhat below the advisory range upon consideration of the § 3553(a) factors. In this memorandum I address more fully the parties' requests and set forth the reasons for the sentence imposed.

2

## I.  SENTENCING PROCEDURE

In light of <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), I typically follow a three-step sentencing process.  First, I determine the applicable advisory guideline range, resolving any objections and factual disputes necessary to that determination.  Second, I determine whether, pursuant to the Sentencing Commission's policy statements, any departures from the advisory guideline range clearly apply.  Finally, I determine the appropriate sentence in light of the factors set forth in 18 U.S.C. § 3553(a).  <u>E.g.</u>, <u>United States v. Greer</u>, 375 F. Supp. 2d 790, 791 (E.D. Wis. 2005).

## II.  GUIDELINE CALCULATIONS

Defendant objected to five guideline determinations in the PSR.

### A.  $1,000,000 From Financial Institutions

First, defendant objected to the 2 level enhancement under § 2B1.1(b)(13)(A) for receipt of more than $1,000,000 in gross receipts from one or more financial institutions. The victims in this case were primarily credit card companies, which defendant argued did not meet the definition of "financial institution" in application note 1.  Note 1 provides, in pertinent part:

> "Financial institution" includes any institution described in 18 U.S.C. § 20, § 656, § 657, § 1005, § 1006, § 1007, or § 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund; any health, medical, or hospital insurance association; brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission; futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading Commission; and any similar entity, whether or not insured by the federal government. "Union or employee pension fund" and "any health, medical, or hospital insurance association," primarily include large pension funds that serve many persons (e.g., pension funds of large national and international

3

organizations, unions, and corporations doing substantial interstate business), and associations that undertake to provide pension, disability, or other benefits (e.g., medical or hospitalization insurance) to large numbers of persons.

U.S.S.G. § 2B1.1 cmt. n.1.

Whether or not traditional credit card companies fall within this definition, the government proved, through the testimony of Agent Angela Sheldon, that several of the issuers were banks or subsidiaries of banks, which clearly fall within the definition, and that defendant derived more than $1,000,000 from them. Those entities were US Bank, First National Bank of Omaha, National City Bank, Citigroup, MBNA, Chase, Bank of America, Fleet Bank, American Express, Bank One, and Juniper Bank. The losses those entities suffered, as detailed on government exhibit 11, totaled $1,052,664.79. Exhibit C to the PSR, which listed the entities upon which the enhancement was based, omitted the American Express loss of $31,799.42, but even if I subtracted that amount the total was more than $1 million. Therefore, the objection was overruled.

## B.     Base OL on Money Laundering

Second, defendant objected to the base OL on the money laundering counts, arguing that because not every dollar involved in the underlying fraud scheme was laundered, it was improper to use the entire amount in setting the base OL. He noted that the amount actually laundered was only $274,000, while the loss amount in the credit card fraud scheme was $1-2.5 million.

The argument was contrary to § 2S1.1(a)(1), which plainly states that if the defendant committed the underlying offense from which the laundered funds were derived, the base level is the OL from the underlying offense. Section 2S1.1(a)(2), conversely, allows the level to be determined based on the value of the laundered funds, but only if sub. (a)(1) does not

4

apply. In the present case, defendant committed the underlying offense and the level for that offense could be determined.

Further, because the money laundering counts and the underlying fraud counts were grouped under § 3D1.2, and application notes 2(C) and 5(B) forbid double counting, use of § 2S1.1 (a)(1) resulted in an incremental increase in the total offense level. Adoption of defendant's argument could result in no additional penalty in all money laundering cases. Therefore, this objection was overruled.

**C.     Sophisticated Laundering**

Third, defendant objected to the 2 level enhancement for sophisticated laundering under § 2S1.1(b)(3). He admitted that the credit card fraud scheme was sophisticated but denied that the money laundering was. He stated that all he did was put funds into the Lands Consulting account, then transfer them to his account.

I agreed that this enhancement should not apply. Both the PSR and the government seemed to meld the conduct on the credit card scheme with the money laundering. Application note 5(B) to § 2S1.1 provides that the court should not impose this enhancement if the sophisticated conduct also formed the basis for an enhancement on the underlying offense. In this case, defendant received an enhancement under § 2B1.1(b)(9)(C) because the credit card fraud scheme involved sophisticated means. Therefore, I could not impose an enhancement under § 2S1.1(b)(3) unless there was independent conduct demonstrating that the laundering itself was sophisticated.

Money laundering under § 1956(a)(1)(B)(i), by it's very nature, involves concealment. The Seventh Circuit requires some "separation" between the underlying offense and the transactions constituting money laundering. United States v. Esterman, 324 F.3d 565, 570

5

(7th Cir. 2003). Thus, in order for this enhancement to apply, the government must show that the laundering was more complex or intricate than that necessary to sustain a conviction, or that present in the typical case. It failed to do so here.

First, although defendant used the Land's Consulting account, this entity, while not conducting legitimate business, was not wholly fictional. It existed, if only to carry on the fraud. Further, the transactions involving Lands were no more intricate than the common laundering scheme. Putting money into a third party account, then transferring it to one's own account or possession is not complex or intricate. It is little more than the minimal amount of separation required to constitute the crime.

Second, the government noted that defendant engaged in several layered transactions. Much of this conduct was also relied upon in imposing the enhancement under § 2B1.1(b)(9)(C). (PSR ¶ 55.) To the extent it was not, I did not find it complex or intricate. Again, it basically involved transferring funds to Land's, then using Land's to pay defendant. Likewise, depositing funds into an account opened by defendant's mother-in-law, then withdrawing them, while evidence of concealment, was no more complex than most laundering schemes.

Third, the government relied on Land's use of a merchant's point-of-sale terminal, but again this conduct was appropriately considered under § 2B1.1. Putting the proceeds of these transactions into the Land's account, then withdrawing them via payroll checks was not sophisticated.

Fourth, the fact that defendant reported income from Lands Consulting on his tax returns may have added an air of legitimacy to his credit card scheme, and perhaps helped conceal it, but it did not make the laundering sophisticated.

6

Finally, the government noted that the credit card fraud scheme could have been completed without the opening of additional bank accounts, use of convenience checks, and transfer of payments from one account to another. However, if defendant's underlying scheme had stopped with the mere fraudulent acquisition of credit cards, no enhancement would have been proper under § 2B1.1(b)(9)(C). The government failed to recognize that application notes 5(B) and 2(C) to § 2S1.1 were designed to prevent the double counting that would often occur under § 2S1.1 if the defendant also committed the underlying offense.

Therefore, because the government failed to demonstrate that the money laundering was more intricate or complex than the typical money laundering scheme, the enhancement did not apply.

## D.    Section 2J1.7 Enhancement

Fourth, defendant objected to the 3 level enhancement under § 2J1.7 for commission of an offense while on pre-trial release. He argued, relying on <u>United States v. DiCaro</u>, 852 F.2d 259 (7th Cir. 1988), that because the record did not reflect that the magistrate judge warned him of the penalties for committing a felony while on release the enhancement should not be applied.

However, defendant was advised, in the written order setting conditions of release, which both he and the magistrate judge signed, of those penalties. (Docket # 3 at 3). In <u>United States v. Night</u>, 29 F.3d 479, 480-81 (9th Cir. 1994), the court rejected an argument that the magistrate judge had to orally advise the defendant of the penalties, holding that advisement in the written release order was sufficient. <u>See also</u> <u>United States v. Oliver</u>, 89 F. Supp. 2d 914, 917 (S.D. Ohio 1999) (finding notice in Order Setting Conditions of

7

Release sufficient). I agreed with these courts and found that in the present case defendant was given sufficient notice, as required by § 2J1.7 and § 3147. The objection was accordingly overruled.

**E.    Aggravated Role**

Finally, defendant objected to the enhancement for role in the offense under § 3B1.1(c). That provision provides: "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels."

The PSR and the government based the enhancement on defendant's recruitment of his wife into the scheme. Defendant argued that she was involved in just one aspect of the scheme and played a minor role; the government countered that she did more – typing documents and applications, signing as a fictitious person, preparing correspondence, and issuing phony payroll checks from Land's Consulting.

In determining whether to apply this enhancement, the court considers the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. U.S.S.G. § 3B1.1 cmt. n.4. All factors need not be present, but the defendant must have exercised some control over others involved in the commission of the offense. United States v. Pagan, 196 F.3d 884, 892 (7th Cir. 2000). The government bears the burden of demonstrating the facts that justify the enhancement. United States v. Joiner, 183 F.3d 635, 644 (7th Cir. 1999).

8

At the evidentiary hearing, Mrs. Dagostini testified that defendant asked her to become involved in his credit card fraud scheme. She typed documents, including birth certificates and driver's licenses, tried to find obituaries of young children so their social security numbers could be used to obtain credit, and issued the payroll checks from Land's Consulting. After defendant's arrest and release, he asked her to pick up mail at boxes he had rented, and she deposited a $20,000 check drawn on an "Augostini" credit card into an account at Pyramax Bank her mother had opened at defendant's request. In February 2005, defendant asked her to make phone calls to various credit card companies to try to keep the cards active. He also asked her to add a name, "Leo Vasquez," to one of the accounts.[1] She also picked up several cards that arrived at their mail box in July 2005, which she gave to her attorney. Mrs. Dagostini testified that the scheme was defendant's idea, and that he recruited her (and her mother) into it.

I found this evidence sufficient to establish that the enhancement should apply. Defendant recruited Mrs. Dagostini, he exercised decision making authority and directed her to take certain actions in furtherance of the scheme. Although it appeared that the proceeds of the scheme were used to support the entire Dagostini family, defendant was the manager or leader of the scheme, and Mrs. Dagostini was a "participant." I did not rely on her mother's involvement in imposing the enhancement because she was not criminally responsible, as required by application note 1 to § 3B1.1.

Therefore, after resolving the objections, the advisory guidelines were OL 36, CHC II, and a range of 210-262 months imprisonment.

---

[1]Defendant met Vasquez in jail, and the government alleged that defendant recruited Vasquez into the scheme.

Case 2:04-cr-00146-LA   Filed 12/01/05   Page 9 of 23   Document 90

### III.  DEPARTURES

Both parties moved for departures from the guidelines.

**A.      Defendant's Requests**

**1.          Cumulative Effects**

Defendant first moved for departure based on the combined effect of the aggregation of overlapping enhancements under the guidelines and the substantial increase in the range they caused.  He noted that the guidelines imposed enhancements for loss and receipt of $1,000,000 from financial institutions based on the same money.   He further argued that the mechanistic application of the guidelines drove his range to a level that bore little relation to his culpability.

I agreed that I was authorized to depart on this basis but concluded that the argument was better considered under § 3553(a).  Therefore, I denied the motion.

**2.          Money Laundering Outside the Heartland**

Defendant next requested a departure because his money laundering was likely not what Congress and the Commission had in mind: He was not involved in drug dealing or organized crime, and he was not a professional money launderer.  He contended that the laundering was merely incidental to his fraud scheme.  However, as the government noted, Congress included other crimes as specified unlawful activity in § 1956.  Further, the money laundering aspect of the guidelines increased the range incrementally, by 2 levels, with an additional 3 being added under § 2J1.7.

10

I was authorized to depart on this basis but declined to exercise my discretion to do so in this case. However, I concluded that I could, under § 3553(a), consider the overlapping nature of the fraud and money laundering schemes.

### 3. Pre-trial Conditions of Confinement

Finally, defendant requested a departure based on the fact that he had been confined in a local jail for about 14 months awaiting trial and sentencing. I agreed that I was authorized to depart when a defendant's conditions of confinement made the time spent more onerous than in the typical case.

However, in this case defendant had only himself to blame for his pre-trial incarceration. His bond was revoked based on his commission of new crimes, and the government presented evidence that he sought to commit further offenses while in the jail. Further, I could not find that the conditions at the Waukesha County jail were oppressive.[2] Sentencing in this case was adjourned on the request of both sides, and to accommodate the court's calendar, which extended defendant's stay at the jail. But under all of the circumstances, I could not conclude that defendant deserved a sentence reduction for this factor.

### B. Government's Motion

The government moved for an upward departure under § 4A1.3, arguing that CHC II understated the seriousness of defendant's record and the risk he would re-offend. Specifically, it alleged that he was involved with his wife, then-girlfriend, in a theft by fraud

---

[2]At the evidentiary hearing, two witnesses testified that while prisons offered more programs than jails, the Waukesha County jail was better than most jails.

11

scheme in 1995 and 1996. Only Mrs. Dagostini was charged at that time, and the record contained no indication why, if he did commit this additional offense, defendant was not.

I agreed that these facts could, in the exercise of discretion, warrant consideration of an upward departure under § 4A1.3. However, I declined to so exercise my discretion in this case. I concluded that CHC II produced an imprisonment range that was more than sufficient to account for defendant's past misconduct and the risk that he would re-offend.[3] Therefore, the motion was denied.

## IV. SENTENCE

In imposing sentence, I consider the factors set forth in § 3553(a), which include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed --

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

---

[3]In making a departure decision, the court must consider both whether it <u>can</u> depart and whether, if so, it <u>should</u> depart. The second question should be answered in the affirmative only if the sentence otherwise called for by the guidelines is insufficient to satisfy the goals of sentencing in 18 U.S.C. § 3553(a)(2). As discussed later in this decision, the range called for by the guidelines was more than adequate, in fact, greater than necessary to satisfy those goals even without an upward departure.

12

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  After considering these factors, I must "'impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2).'" United States v. Galvez-Barrios, 355 F. Supp. 2d 958, 960 (E.D. Wis. 2005) (quoting 18 U.S.C. § 3553(a)).  I typically group the § 3553(a) factors into three categories: the nature of the offense,  the history of the defendant, and the needs of the public and any victims. United States v. Ranum, 353 F. Supp. 2d 984, 989 (E.D. Wis. 2005).  I then consider the types of sentences available, the guidelines and policy statements, and the need to avoid disparity in order to produce a reasonable numerical sentence.

A.    **Nature of Offense**

Defendant operated a large and sophisticated credit card scheme, using multiple fake identities and a shell business, causing more than $1,000,000 in losses to various credit card companies.  I did consider it a mitigating factor that defendant did not steal the identity or ruin the credit of any living person in operating the scheme.  Nevertheless, the crime was serious based on its breadth.

I did not find that the money laundering aspect added much to the severity of the offense.  Defendant funneled the proceeds of the fraud through accounts bearing fake names, but this was part of obtaining the cards in those fake names, and he used the Land's Consulting business to pay himself, also an important part of the scheme, as it allowed him to obtain cash.

13

**B.      Character of Defendant**

Defendant was 46 years old, married, with three children, twins age six and a daughter age three, and one step-child, age 12.  He worked in the casino business from 1990 to 1999, but since then appeared to have supported himself and his family through illegal means.  He had a minimal prior record with one conviction for obtaining a controlled substance by fraud.  He was placed on probation for that crime and successfully completed supervision.

Defendant presented evidence of significant mental health problems, as well as a history of prescription drug abuse.[4]  Dr. Deborah Collins tested and interviewed defendant, and concluded:

> Mr. Dagostini's MMPI-2 profile, in particular, indicated the likelihood that he is presently overwhelmed by anxiety and depression, factors which, to some extent, reflect a chronic level of functioning.  Similar individuals may feel helpless and inadequate.  He endorsed a preoccupation of feelings of guilt and lack of self-worth.  Individuals with similar profiles may attempt to control or manage anxiety by intellectualizing or overly analyzing details.  This behavioral pattern is likely to be chronic as compared to an artifact of his current legal predicament.  While Mr. Dagostini's current level of anxiety and emotional distress is likely to be heightened given his life circumstances, there is indication that in the broader view he has struggled with longstanding beliefs about personal inadequacy, low self-esteem, and anxiety.

> Present test findings did not yield evidence of a pervasive anti-social characterlogical structure.  There is no indication of a major mental illness on a spectrum of a thought disorder.  Similar individuals, however, are likely to harbor low-grade sadness or depression, complicated by recurring periods of

---

[4]Defendant's prior conviction involved his obtaining of Temazepam (Restoril) by false representation.  Defendant submitted a forged prescription note to a pharmacist in order to obtain the drug.  After his arrest, defendant told officers that he was addicted to drugs which helped him sleep.  (PSR ¶ 77.)  According to his probation file, defendant satisfactorily completed supervision, including out-patient drug treatment and voluntary attendance of weekly NA meetings.  He remained drug free while on supervision.  (PSR ¶ 78.)

14

anxiety. Mr. Dagostini may attempt to cope with his anxiety and depression by becoming overly involved in an idea or plan. [He] is likely to tend to ruminate about an idea or problems, as compared to actively seeking assistance from others. Similar individuals may periodically become so self-absorbed and lost in thought that they confuse fantasiful or wishful thinking with reality. I would note Mr. Dagostini's history of limited social activity, preoccupation with the details and circumstances surrounding the pending charges. Mr. Dagostini's tendency to withdraw or avoid close interpersonal relationships is likely to render him without support commonly found in them. There is evidence both in his history and tests results of an anxiety disorder.

Individuals with similar test results tend to be overly ideational and prone to unproductive and obsessive thinking. From a treatment perspective, they may be more responsive to supportive, goal-directed therapy as compared to insight-oriented therapies. Treatment goals should include his history of substance abuse and the development of coping mechanisms for dealing with stress and anxiety.

**Diagnoses**: Based upon the records reviewed, history obtained, and current observations, the diagnoses are: **Anxiety Disorder, Not Otherwise Specified** and **Sedative, Hypnotic, or Anxiolytic Abuse (by history).** Those opinions are offered to a reasonable degree to professional certainty.

(Dr. Collins's July 15, 2005 Report at 4-5, emphasis in original.)

She continued:

While acknowledging his current and past legal problems, however, there is no indication of a history of pervasively violent or antisocial tendencies, attitudes or behavior. To the contrary, Mr. Dagostini's history reflects his capacity for prosocial behavior, moral emotions (i.e., sympathy, remorse) and conduct. I would note his prior positive adjustment to a period of supervision. Mr. Dagostini's demonstrated capacity for moral emotions and current level of subjective emotional distress are factors likely to contribute to his potential to benefit from treatment opportunities which may be afforded him.

. . .

To his credit, Mr. Dagostini is expressly willing and motivated to redirect his activities in prosocial and constructive ways. He is willing to avail himself of whatever treatment opportunities he is afforded. He is regretful for the impact of his conduct on his family and concerned for their wellbeing.

15

(Id. at 5-6.)  Mrs. Dagostini indicated that defendant had an obsessive personality, and that when he got involved in something he could not stop.  She also stated that he appeared ready for treatment.

## C.     Needs of Public

There was no evidence that defendant was physically dangerous, but there was a risk of recidivism given his criminal conduct over a period of years and his commission of new offenses after being charged.  There was also a need for confinement to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter others.  The victims were due $1,216,557.64 in restitution.

## D.     Imposition of Sentence

The guidelines called for a term of 210-262 months.  For four reasons, I found that a sentence within that range was somewhat greater than necessary to satisfy the purposes of sentencing under the circumstances of this case.

First, the money laundering was an intricate part of the credit card fraud scheme, and I could not conclude that it was necessary to impose significant additional prison time for this closely related conduct.  The amount laundered, about $274,000, was small compared to the overall scheme, which took in more than $1,000,000.  One of the goals of the Sentencing Reform Act ("SRA") was to ensure that defendants were sentenced based on what they actually did, and to reduce the impact of charging decisions on the sentence.[5]

_____

[5]Defendant noted that the government did not obtain approval from main Justice for the money laundering charges, as required by the U.S. Attorney's Manual. However, because the Manual creates no rights in defendants and charging decisions are within the province of the government, I did not rely on this fact in imposing sentence.  However, because sentencing is a judicial rather than executive function, it was within my discretion to consider the effects of the charging decision on the

16

I found it appropriate to, in effect, reduce the offense level by 1 for this factor.[6] 18 U.S.C. § 3553(a)(1).

Second, defendant had significant mental health issues, including an obsessive component, which likely contributed to his continued criminal conduct, which in turn substantially elevated the range. The report of Dr. Collins, discussed above, indicated that defendant was amenable to treatment, had the capacity for pro-social behavior, and could be supervised in the community. This last finding lead to me to conclude that a lesser prison sentence, but with maximum supervised release, would be sufficient to protect the public.

Third, I questioned whether the purposes of § 3B1.1 were served by imposition of the role enhancement in this case. The commentary to that guideline states:

> This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate.

U.S.S.G § 3B1.1 cmt. background.

In the present case, although the enhancement technically applied due to defendant's recruitment and direction of his wife, I did not believe that this fact significantly increased his culpability. Defendant did not recruit anyone outside of his family. He was not seeking to create a larger criminal enterprise. Further, the money he obtained was used to support the

———————————

sentence.

[6]While courts need not strictly justify statutory sentences by reference to the guidelines or identify non-heartland factors to justify sentences above or below the range, in exercising discretion, courts can use guideline terminology to quantify their findings. See, e.g., United States v. Alexander, 381 F. Supp. 2d 884, 890 (E.D. Wis. 2005); Galvez-Barrios, 355 F. Supp. 2d at 964.

17

family, including Mrs. Dagostini and their children. Defendant did not profit more than other participants. Finally, Mrs. Dagostini was a willing participant and assisted defendant in his scheme, just as it appears he may have assisted her in the scheme she was convicted of in 1995. Thus, I saw no greater likelihood of recidivism based on defendant's involvement of his wife in the scheme.

The combined effect of the mental health factor and the role enhancement caused me to, in effect, reduce the sentence by 1 additional level. 18 U.S.C. § 3553(a)(1).

Fourth, although defendant did not qualify for a 3 level reduction for acceptance of responsibility under § 3E1.1 based on his commission of a new crime while on pre-trial release and his apparent commission of new fraudulent conduct while in the Waukesha County Jail (PSR ¶ 71), he did plead guilty (without a plea agreement) and thus spared the court and the government the time and expense of what would have likely been a very lengthy and complicated trial. I concluded that he should receive some consideration for this – the equivalent of 1 level by analogy to § 3E1.1(b). The primary purpose of the reduction under § 3E1.1(a) is to "reflect the reduced risk of recidivism of a defendant who by facing up to the wrongfulness of his conduct takes the first step to better behavior in the future." United States v. Lopinski, 240 F.3d 574, 575 (7th Cir. 2001). Defendant forfeited that reduction by continuing his fraudulent conduct. However, the primary purpose of § 3E1.1(b) is to reward an additional 1 level reduction if, "by timely notifying authorities of his intention to enter a plea of guilty, [the defendant thereby permits] the government to avoid preparing for trial and permit[s] the government and the court to allocate their resources efficiently." U.S.S.G. § 3E1.1(b). Defendant did that here, so in the exercise of discretion under § 3553(a)(1), (4) & (5), I gave him some consideration.

18

Therefore, with these reductions to take into account my consideration of the § 3553(a) factors, the effective advisory range was 151-188 months.  I concluded, based on all of the circumstances, that a sentence at the low end of that range was sufficient but not greater than necessary to satisfy the purposes of sentencing.  18 U.S.C. §§ 3553(a), (a)(2).

The government's recommended sentence, originally 292-365 months, 262 months after my findings on the guidelines and denial of it's § 4A1.3 motion, was far greater than necessary to satisfy the purposes of sentencing.  A sentence of 22 to 30 years would exceed the statutory maximum for crimes such as bank robbery, 18 U.S.C. § 2113(a), assault with intent to commit murder, 18 U.S.C. § 113(a)(1), racketeering, 18 U.S.C. § 1963(a), and sexual abuse, 18 U.S.C. § 2242.  It also exceeds the mean sentence for murder.  U.S. SENTENCING COMMISSION, 2003 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS 31 (2003) (247.5 months).  Further, given defendant's age, 46, this recommendation amounted to a near-life sentence.[7]  In sum, I concluded that such a sentence would be disproportionate to the crime committed and contrary to the parsimony provision of § 3553(a).  See United States v. Newsom, 402 F.3d 780, 785-86 (7th Cir. 2005) (noting that after Booker district court may, on consideration of § 3553(a) factors, conclude that the sentence called for by guidelines is greater than necessary), appeal after remand, No. 03-3366, 2005 U.S. App. LEXIS 23641 (7th Cir. Nov. 2, 2005).[8]

---

[7]According to the CDC, average life expectancy is 77 years. http://www.cdc.gov/nchs/fastats/lifexpec.htm.

[8]On the other hand, defendant's recommended sentence – six years – was far too low to satisfy the purpose of sentencing under § 3553(a)(2).  Defendant's criminal conduct extended over a period of years, caused over $1 million in losses, and did not abate even after he was arrested.  Therefore, a sentence of six years would have failed to provide just punishment, protect the public, and deter others.

19

The government also opposed any reductions to the advisory range. First, it argued that defendant should receive no credit for pleading guilty, noting that he refused to enter into a plea agreement and contested certain facts at sentencing. However, the facts to which defendant refused to stipulate concerned his alleged commission of new crimes while in jail, which the government indicated it may still charge. Thus, it would be improper – and in considerable tension with the Fifth Amendment – to hold that against him. Finally, the Sentencing Commission has determined that saving the court and the government the expense of a trial is worth consideration.

Second, the government disagreed with Dr. Collins's report, noting that defendant's alleged commission of additional offenses after her interview showed that he was calculating rather than obsessive or depressed. However, the government produced no contrary expert report or evidence, and Dr. Collins's diagnosis stood uncontradicted in the record. The government also objected to Mrs. Dagostini's characterization of defendant as "obsessive," noting that she is not a psychiatrist. However, she probably knew defendant better than anyone who spoke at sentencing, and her assessment was consistent both with Dr. Collins's report and the facts of the case.

Third, the government argued that because of his alleged continued unlawful conduct in jail defendant should receive no consideration under § 3553(a). However, defendant lost a 2 level reduction under § 3E1.1 in part because of this conduct (PSR ¶ 71), and the government indicated that it may later charge him with new offenses.[9] Further, I concluded

_____

[9]It is unclear whether <u>Booker</u> will have an effect on decisions such as <u>United States v. Watts</u>, 519 U.S. 148 (1997) and <u>Witte v. United States</u>, 515 U.S. 389 (1995), which allowed additional punishment based on previously charged, uncharged, and acquitted conduct. However, it is clear that after <u>Booker</u> courts are not <u>required</u> to

20

that defendant's mental illness, as explained by Dr. Collins, played a role in this alleged conduct. Finally, I concluded that the risk of recidivism was sufficiently addressed by a sentence of 151 months, a substantial term, one far in excess of what I typically imposed in fraud cases.

Finally, this sentence did not create unwarranted disparity. Indeed, one of the reasons for the reduction was to mitigate the effects of the government's charging decisions. As noted, the SRA was designed to produce sentences based on what the defendant did, not just what he was charged with. Further, the sentence was supported by specific reasons particular to the case under § 3553(a). And, as noted, the sentence nevertheless exceeded that imposed in virtually all white collar and fraud cases I have handled.[10]

## V. CONCLUSION

For all of these reasons, and considering the types of sentences available, I imposed a total sentence of 151 months, which I concluded was sufficient but not greater than necessary after considering all of the factors under § 3553(a). I was required to impose the sentence on count 4 to run consecutively under § 3147, and in so doing I followed the methodology suggested in U.S.S.G. § 2J1.7 cmt. n. 2 in structuring the sentence.

Therefore, I committed defendant to the custody of the Bureau of Prisons for 120 months (the statutory maximum) on count 1, and 130 months on counts 2 and 3 to run

_____

base a sentence on such conduct.

[10]I also note that the sentence imposed in the present case was in excess of the median sentence for every listed category of offenses kept by the Sentencing Commission except murder, and greater than the mean sentence for all but murder and kidnaping/hostage taking. U.S. SENTENCING COMMISSION, 2003 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS 31 (2003). The mean fraud sentence in 2003 was 14.4 months and the mean money laundering sentence was 45.3 months. Id.

Case 2:04-cr-00146-LA   Filed 12/01/05   Page 21 of 23   Document 90

concurrently, and 21 months on count 4 to run consecutively to counts 1-3, for a total of 151 months. Based on his financial situation and the amount of restitution, I determined that defendant did not have the ability to pay a fine and so waived the fine. I ordered him to make restitution in the amount of $1,216,557.64 to the victims as set forth in ¶ 120 of the PSR.[11] Upon consideration of his ability to pay, I ordered that he make payments of not less than $10/month while in prison pursuant to the Inmate Financial Responsibility Program, see 18 U.S.C. § 3664(f)(3), and payments of not less than $200/month upon his release. I indicated a willingness to revisit this issue if my forecast of his ability to pay turned out to be incorrect.

Upon release, I placed defendant on supervised release for 3 years on counts 1 and 3, and 5 years on counts 2 and 4. I imposed the maximum term given the amount of restitution due and to ensure that defendant deals with his substance abuse and mental health treatment needs. The conditions of supervision appear in the judgment.

_____

[11]At sentencing, defendant argued that under United States v. Day, 418 F.3d 746 (7th Cir. 2005), the court had discretion whether to order restitution. However, Day involved an offense under Title 49, which fell outside the mandatory coverage of § 3663A. Thus, restitution in that case was permissive under § 3663. Id. at 757 n.7. In the present case, conversely, defendant's crimes fall within the mandatory restitution provision of § 3663A. See, e.g., United States v. Pawlinski, 374 F.3d 536, 539 (7th Cir. 2004). Even if I had such discretion, in the present case I would have ordered restitution. While defendant's financial prospects in prison will be limited, he will have the ability to earn when he is released. Further, I followed the requirements of Day by setting the amount of restitution payments at the time of sentencing but allowing the issue to be reconsidered if my prediction of defendant's ability to pay turned out to be inaccurate. See id. 761. Thus, if the Bureau of Prisons, the Probation Office, the government or defendant notify me of changed circumstances, I may alter the payment schedule.

22

**SO ORDERED**.

Dated at Milwaukee, Wisconsin, this 1st day of December, 2005.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge